O'Neill, *et al. vs.* Smith, Adm'r of O'Neill.

(Decided 31st January, 1871.)

ALVEY, J., dissented.

---

ARTHUR O'NEILL, ANN O'NEILL, and others *vs.* MICHAEL SMITH, Administrator *c. t. a.* of JAMES O'NEILL, deceased.

*Nuncupative Wills—Delay or Laches as a defence.*

An oral disposition of property on the day immediately preceding his decease, by one who had been an invalid for fifteen years, and for eight months previous to his death had been confined to the house, gradually yielding to the ravages of consumption, had been admonished by his physician that recovery was hopeless, and who died in the full possession of his faculties, will not be recognized as a nuncupative will.

An alleged nuncupative will was admitted to probate by the Orphans' Court, on the 2d of July, 1864, and letters of adminstration, with the will annexed, were granted, and the estate of the deceased distributed. No summons or order of publication for the heirs-at-law of the deceased was directed by the Orphans' Court. On the 27th of April, 1866, a petition was filed by certain heirs-at-law of the deceased, non-residents, assailing the validity of the will. The administrator, in his answer, objected that it was too late to have the matter of the will reöpened and reëxamined. HELD :

That there was not such delay or *laches* on the part of the petitioners as to preclude them from impeaching the will.

APPEAL from the Orphans' Court of Baltimore City.

On the 2d day of July, 1864, the Orphans' Court of Baltimore City passed an order admitting to probate what was alleged to be the nuncupative will of James O'Neill, deceased,

under which Mary Smith, the wife of the appellee, claimed as sole legatee. The will consisted of three affidavits made before the Register of Wills, on the 25th of June, 1864, by John Kelly, Robert Kelly and Anna Reiley—John and Robert being the sons, and Anna the sister, of the legatee under the will.

John Kelly, who resided with the appellee, his step-father, with whom James O'Neill boarded, testified that, being at home on the 7th of June, 1864, he was sent for to go to the chamber of O'Neill, which he did; that thereupon O'Neill arose from his bed, went to his trunk and got a book out, and gave it to Mary Smith, saying: "This is all that I have, and I give it all to you; you have been so kind to me since I have been sick;" that O'Neill called upon the affiant and his brother Robert and Anna Reiley to be witnesses to what he had said, "this is my will."

Robert Kelly testified that, being at the house of the appellee, on the 7th of June, 1864, and being called by some person, he went into the chamber of O'Neill, who beckoned for him to come near his bedside, which he did; that O'Neill had a portfolio on his bed, which he opened and looked over and then said to Mary Smith, handing the portfolio to her— "here is all that I have got or own; you have been very kind to me; this is all that I have got, and I give it all to you; let these be your witnesses," pointing to John Kelly and Anna Reiley.

Anna Reiley testified that she called at the house of the appellee on the 7th of June, 1864, and was asked by Mary Smith to go up stairs and see James O'Neill, with whom she had been acquainted slightly for ten years past; that O'Neill handed a key to Mary Smith, with which she opened his trunk, at his request, and handed him the papers therein; that O'Neill thereupon handed the papers back to Mrs. Smith and said: "All my share is yours; you have always been kind to me; I have come to your corner to die, and leave all my share or all I got to you;" and said to the

deponent, and to Robert and John Kelly, who were present in his chamber: "Take notice to this, sharp, that all I have I leave to Mary Smith."

James O'Neill died on the following day. Letters of administration upon his estate, with the will annexed, were granted to the appellee, who proceeded to distribute the estate.

On the 27th of April, 1866, certain heirs-at-law of James O'Neill, and non-residents, filed a petition in the Orphans' Court praying that the proceedings theretofore had in the matter of the estate of James O'Neill might be opened, and the case again examined and heard; that the letters of administration granted to the appellee might be revoked, and that the petitioners, as heirs-at-law of the said O'Neill, be allowed to receive their respective proportions of his estate.

The appellee answered this petition on the 22d of April, 1867. The answer admitted that O'Neill died possessed of certain personal estate, but denied that he was possessed of any real estate. It also admitted the granting of letters of administration to the respondent, and charged that the nuncupative will of James O'Neill was properly admitted to probate, and that it was then too late to have the proceedings reöpened, and the matter of the will of the deceased reëxamined. On the 30th of April, 1869, the Court passed an order dismissing the petition. From this order the present appeal was taken.

The cause was argued before BARTOL, C. J., BRENT, ALVEY and ROBINSON, J.

*N. M. Busey* and *Henry Stockbridge,* for the appellants,

Referred to the following authorities: *Lemann vs. Bonsall,* 1 *Add. Eccl. Rep.,* 389; *Prince vs. Hazleton,* 20 *Johns.,* 501; *Priscilla Yarnall's Will,* 4 *Rawle,* 46; *Boyer vs. Frick,* 4 *Watts & Ser.,* 360; *Werkheiser vs. Werkheiser,* 6 *Watts & Ser.,* 184; *Haus vs. Palmer,* 21 *Penn.,* 296; *Dorsey vs. Sheppard,* 12 *G. & J.,* 192; *Welling vs. Owings, et al.,* 9 *Gill,* 470.

*John C. King,* for the appellee,

Relied on the following cases : *Brayfield vs. Brayfield,* 3 *H. & J.,* 208 ; *Dorsey vs. Sheppard,* 12 *G. & J.,* 199 ; *Dockum vs. Robinson,* 6 *Foster, N. H.,* 372 ; 1 *Redfield on Wills,* 192 ; *Hubbard vs. Hubbard,* 4 *Selden,* 196 ; *Baker vs. Dodson,* 4 *Humph.,* 342 ; *Parsons vs. Parsons,* 2 *Greenl.,* 298.

ROBINSON, J., delivered the opinion of the Court.

Whatever may have been the earlier rule of law in regard to *nuncupative wills,* at a time when the art of writing was known to comparatively a few persons, it was well settled, we think, even prior to the Statute of Frauds, that to be valid, "they must be made in the last extremity, when the testator did not expect to recover, and had not time to make a more deliberate will or a will in writing." 1 *Redfield on Wills,* 185.

So early as the reign of Henry VIII, a nuncupative will was defined by Perkins to be properly when the testator "lieth languishing for fear of sudden death, darest not to stay the writing of his testament, and, therefore, he prayeth his curate and others, his neighbors, to bear witness of his last will, and declareth by word what his last will is," and this definition is substantially adopted in *Bacon's Abridgment, Wood on Conveyancing,* and other standard writers.

By the Statute of Frauds, further restrictions were thrown around the making of wills of this character, and to such an extent, says Sir WILLIAM BLACKSTONE, "has the Legislature provided against any frauds in setting up nuncupative wills, by so numerous a train of requisites, that the thing itself has fallen into disuse, and hardly ever heard of, but in the only instance where favor ought to be shown to it, when the testator is surprised by sudden and violent sickness."

Now, the 306th section of Article 93 of our Code, is but a transcript of the 19th section of 29 Charles II, and the words *"last sickness"* in the Code are to be interpreted and

understood according to the well known construction put upon these words under the British statute.

We do not purpose at this late day to review the law on this subject, because this has already been done in a very satisfactory manner by Chancellor KENT, in *Prince vs. Hazleton,* 20 *Johns., Rep.,* 502, a case involving a large amount of property and argued on both sides by distinguished counsel. After a well considered examination of the authorities, the Chancellor says:

" I feel myself warranted in concluding, that a nuncupative will is not good, unless it be made by a testator when he is *in extremis,* or overtaken by sudden and violent sickness, and has not time or opportunity to make a written will. * * The last sickness, in the purview of the statute, has been always understood to apply to the last extremity mentioned in the books, and it never was meant to uphold these wills, made when there was no immediate apprehension of death, and no inability to reduce the will to writing." These views are fully adopted in *Priscilla Yarnall's Will,* 4 *Rawle,* 46 ; *Haus vs. Palmer,* 21 *Penn.,* 296, and in fact in almost every State where the 19th section of 29 Charles II, has been adopted.

From these authorities it is clear that the general rule requiring wills to be in writing, was intended to be as universal as was possible ; and the exception thereto in favor of a *nuncupative* will was allowed only in cases of necessity, where the testator surprised by approaching death has not the time or opportunity to make a written will. Thus tested, how stands the will in this case?

The alleged testator it seems was an Irishman by birth, but for many years a resident of the city of Baltimore, and for some time prior to his death a boarder in the house of Michael Smith, the wife of whom, is the party claiming under this will. He had been, according to the testimony of his physician, an invalid for at least fifteen years, and for eight months previous to his death confined to the house,

O'Neill, *et al. vs.* Smith, Adm'r of O'Neill.

gradually yielding to the slow but sure and steady approaches of that most fatal of all diseases, pulmonary consumption. The *nuncupation* was made in the early part of the forenoon of June the 7th, and on the day following, in the full possession of his senses the testator died.

Here there is an attempt to set up a nuncupative will for a party living in a populous city, languishing for months under a disease the fatal termination of which was certain — admonished by his physician that recovery was hopeless — living a day at least after the alleged *nuncupation* and according to the testimony, in the full possession of his senses to the hour of his death. It must be admitted that there was ample time and opportunity to make a written will, and to sustain a nuncupative will under such circumstances, would obliterate all distinctions which the law has wisely drawn between written and unwritten wills, and open wide the door to frauds and perjuries, to prevent which, the Statute of 29 Charles II, was passed.

The only remaining question, is whether the appellants by reason of any delay or *laches* on their part, have lost their right to assail this will; without intending to admit, that mere lapse of time would operate as a bar in any case, we are of opinion that the appellants are not precluded by any supposed delay from contesting the validity of this will.

They were non-residents, and the Orphans' Court neither directed summons nor order of publication for the heirs-at-law, and they had not therefore either actual or constructive notice. The petition was filed within twenty-two months after the death of the testator, and for aught that appears to the contrary as soon as they had notice of the alleged will. Surely under such circumstances they cannot be said to have lost their right to impeach the will in question.

For these reasons the order of the Court below will be reversed and the cause remanded.

*Order reversed and cause remanded.*

(Decided 31st January, 1871.)