ANN BIDDLE *vs.* MARY E. BIDDLE and L. A. CAV-
ENDER, Administrators of LAURA L. BIDDLE.

*Nuncupative Wills—Construction of Article 93, sec-
tion 306, of the Code—Rogatio testium.*

To constitute a valid nuncupative will, there must be evidence of a sound
and disposing mind on the part of the testator, a present intention to
dispose, and apt words of disposition; and the *factum* of the will must .
be proved by the oaths of three witnesses at least, who were present at
the making thereof; and it must also be proved that the testator at the
time of pronouncing the will, requested the persons present, or some of
them, to bear witness that such was his will, or something equivalent
thereto; all of which must concur in the last sickness of the deceased.

The words "to that effect," in section 306, of Article 93, of the Code of
Public General Laws, do not qualify the whole section, or all its pre-
ceding provisions, but only the last clause of the sentence, to which
they are annexed, that is, "to bear witness that such was his will."
This may be done in the language of the Code, or by equivalent words.

The "*rogatio testium*," required by the Code as essential to the validity
of a nuncupative will, cannot be supplied by inference from the nun-
cupation itself.

APPEAL from the Circuit Court for Cecil County.

The. alleged nuncupative will of Laura L. Biddle, pro-
pounded by the appellant, who claimed as sole legatee,
consisted of four affidavits or depositions taken before the
Orphans' Court of Cecil county, on the 10th of January,
1871.

Almira V. Bramell testified that she knew Laura L.
Biddle; she died in the latter part of August, 1870; on
the 23d, she thought; she died at Miss Ann Biddle's, Chesa-
peake city, Cecil county, Maryland; that was her home, and
to deponent's knowledge she had been residing there seven-
teen months; she died Wednesday evening; it was after
dark; about four o'clock in the morning of that day she
called, "doctor;" then she said, "money;" then she called,
"aunty;" then she said, "money" a number of times over;

then Mrs. Hayes said, " Laura, do you want your aunty to have your money?" She said, " Yes, all my money," and she raised her head from her pillow and her eyes followed her aunt Nancy; her aunt Nancy was in the room, but not by the bed; while she was talking this way, her eyes were following her aunt Nancy; she was in her right mind; the doctor was not in the house any time during this conversation; she did not say she wished us to remember these words as her will; she did not say so in words; Laura was nineteen years of age; had known Laura L. Biddle about fifteen months; knew her intimately; had seen her, on an average, two or three times a day during that period; between five and ten minutes after the conversation above detailed, she asked her aunty for some laudanum, and her aunty gave it to her—after which she went to sleep and slept till after daylight, and when she awoke she talked a great deal and incoherently; deponent could not make out anything she said.

Matilda White deposed that Laura L. Biddle died in the latter part of August, 1870; she died at Miss Ann Biddle's; deponent was there on the morning before she died; Mrs. Hayes, Mrs. Bramell, Miss Ann Biddle and deponent were there in the morning before she died; she first called, " doctor;" she said, " my money;" then she said, " my aunty;" Mrs. Hayes then asked her if she wanted her aunty to have her money; she said, " Yes;" then Mrs. Hayes asked her if she wanted her aunty to have all her money, and she said, " Yes, all my money;" Miss Ann Biddle was passing backwards and forwards through the room; when she spoke the above words, she looked towards her aunt; she did not ask deponent to remember the above words; she was in her right mind.

Cena B. Hayes deposed that Laura L. Biddle died in August, in the latter part, in the year 1870, in Chesapeake city, Cecil county, Maryland, at Miss Nancy Biddle's; she was living there, and had been all her life at Miss Nancy Biddle's; about four o'clock of the morning of the day she

died, she called, " doctor ; " then she called, " money ; " then she called, " aunty," and looked towards her aunt as she was crossing the room—her aunt, Miss Ann Biddle; deponent asked Laura L. Biddle if she wanted her aunty to have her money, and she said, " Yes, all my money ; " Laura L. Biddle always called Miss Ann Biddle " Aunty ; " her other aunts she gave them their Christian names in addition, as, " Aunt Mary ; " I think she was in her right mind at the time ; while her aunt, Miss Ann Biddle, was in the room, and while she was speaking, as above stated, her eyes were continually following her.

Ann Biddle deposed that Laura L. Biddle died at Chesapeake city, in Cecil county, State of Maryland ; deponent was not certain, but thought it was about the 23d of August, 1870 ; it was at my house ; I am her great aunt ; she always called me " Aunty " simply, without any addition ; she lived with me, and has ever since she was nine years old, and lived there at the time of her death ; on the day she died I was in her room ; before daylight, on the morning of the day she died, I heard Mrs. Hayes say, " Laura, do you want your aunty to have your money ? " and she replied, " Yes, all my money ; " she was nineteen years old on the 18th of August past ; she was in her right mind ; in speaking to me, she called me " Aunty," sometimes " Aunt Nancy ; " her other aunts she always called them by their Christian names, as, " Aunt Mary.".

At the instance of the appellant, an issue, to be found set out in the opinion of the Court, was transmitted from the Orphans' Court to the Circuit Court, for trial.

At the trial it was admitted that the estate of Laura L. Biddle, at the time of her death, exceeded $500 in value.  It was also proved that Laura L. Biddle died of consumption ; that she had been sick of that disease since April preceding her death, and since some time in June of the same year, had been attended and constantly visited by Dr. Wallace ; that for about a month she was confined to the house, but was

passing from one room to another until near the time of her death, and before her death had been confined to her bed; but that the doctor had never told her, nor did it appear that any person had ever told her, until the morning of the day of her death, that she was about to die, or that her case was hopeless.

It was further proved that in the afternoon of the day preceding her death, she talked about what she would do when she got well; that afterwards, about midnight of the same day, she was taken much worse, and her friends were very much alarmed on her account, and thought she was about to die, and sent for her physician, Dr. Wallace, and she herself appeared to be alarmed, and her voice was changed; that about four o'clock in the morning she became very restless and uneasy, and apparently excited, and tried to talk, but had much difficulty in utterance; that she raised her head from her pillow and looked around the room, her eyes following the plaintiff, whom she always called "Aunty," who was passing about the room, and spoke with difficulty.

Dr. Wallace testified that when he was sent for on the morning of the day of her death, he was told by the messenger who came for him that she wanted to make a will, and he took with him pen, ink and paper for the purpose of writing a will for her if she desired it; that he arrived at the house after daylight, but took no note of the hour, and could not pretend to fix the exact time—it was shortly after the alleged nuncupation; that he told the persons present to leave the room, which they did, and he said to her, "Laura, I have come prepared to write your will, and will do so if you wish it," or words to that effect; she made no answer whatever; he repeated it in the same or similar words, and instead of replying to what he had said, she said, "Doctor, do you think I will die?" to which he replied, "Yes, Laura, I think you will;" to which she made no reply, but turned over in her bed and commenced to cry; these were the only words she uttered during the whole of that visit or ever afterwards, to witness' knowledge.

At the trial two exceptions were taken—one to the refusal of the Court to allow the plaintiff to testify in her own behalf, the other to the ruling of the Court on the prayers.

*First Exception:* Is sufficiently stated in the opinion of the Court.

*Second Exception:* The plaintiff offered the following prayers:

1st. If the jury believe from the evidence that Laura L. Biddle died on the 23d of August, 1870, and that upon that day, in the presence of three or four creditable witnesses, did pronounce the words, " doctor," and " money," and " aunty," and that thereupon Cena B. Hayes, one of the witnesses, asked her if she wanted her aunty to have her money, and that she replied, " Yes, all my money," in the manner and under the circumstances as testified to by said witnesses, and stated in the alleged nuncupative will propounded to the Orphans' Court of Cecil county, on the 10th of January, 1871, and that at the time of said speaking the said Laura intended thereby to make her last will and testament, and that she was of sound and disposing mind and capable of executing a valid deed or contract; and shall further believe, that at the time of pronouncing the said will she did bid the persons present, or some of them, to bear witness that such was her will, or to that effect, and shall also believe that the said alleged nuncupative will was made at the time of the last sickness of the said Laura, when she was under the immediate apprehension of death and unable to execute a formal will, and at the house of her habitation, where she had resided for more than ten days, then their verdict must be for the plaintiff.

2d. In making a will there is no magic in words, and the disposition of a testator's effects may be as valid when expressed in the form of a wish, or desire, or request, as when in the most impressive words of command.

3d. That in order to satisfy that portion of the law which requires that a testator, in making a nuncupative or verbal

Biddle vs. Biddle and Cavender, Adm'rs.

will, "shall bid the persons present, or some of them, to bear witness that such was his will, or to that effect," it is sufficient, if the jury believe from the evidence that the said Laura L. Biddle meant to direct the disposition she wished to be made of her money after her death, and did, by intelligent act and language, invoke the special attention and attestation of the persons present, or some of them, to what she was going to say, or had said, in constituting such disposition.

4th. That the bidding of the witnesses "to bear witness that such was her will," required by the statute, may be expressed by any words or acts which, in connection with the surrounding circumstances, the jury may find did clearly and intelligently indicate to the witnesses, or some of them, that such was her wish and intent.

5th. That although it is necessary that the said Laura, in speaking the words contained in the alleged nuncupative will, intended them to operate as, and express the disposition she wished to be made of her effects after death, yet it is not necessary that she should tell the witnesses, or any of them, in words, that she wished to make a will; but such intention may be implied from facts and circumstances surrounding the transaction.

6th. If the jury believe the said Laura uttered the words contained in the alleged nuncupative will, then, in ascertaining whether she intended them to operate as, and express the disposition she wished to be made of her money after her death, the jury may consider whether she was conscious of extreme illness, or whether she apprehended the probability of the near approach of death. They may also consider the signification, in ordinary parlance, of the words she used, and in connection with the circumstances under which they were uttered, and her previously expressed wish to make a will, in connection with the words addressed to her. They may consider said words also in connection with her physical inability to be more explicit, if they believe such physical inability.

They may consider whether said words were uttered in serious earnest, or as loose, casual conversation. If they believe the said words were uttered seriously, and imparted in themselves a gift, then they may consider whether said words imported a present gift of her money to her aunty, to take effect immediately, or whether they imported a gift to her said aunt, to take effect at the time, and only in the event of her death. They may consider whether the conversation in which said words were uttered originated with her. They may consider also, whether the words, under the circumstances, are capable of any other rational explanation than that she desired by them to express her wishes as to the future disposition of her money in the event of her death.

The defendants asked the Court to instruct the jury as follows:

That under the evidence in this case, they must find that the alleged nuncupative will of Laura L. Biddle, propounded to the Orphans' Court on the 10th of January, 1871, as the last will and testament of said Laura, was not in fact and in law her last will and testament.

The Court (WICKES and STUMP, J.) rejected the prayers of the plaintiff, and granted the prayer of the defendants. The verdict and judgment being for the defendants, the plaintiff appealed.

The cause was argued before BARTOL, C. J., STEWART, BOWIE and ALVEY, J.

*Albert Constable* and *Henry W. Archer*, for the appellant.

The third and fourth prayers of the appellant correctly announced the law as to the "*rogatio testium*" by the testator in making her will, to bear witness that such was her will. 1 *Redfield on Wills,* 201, sec. 37, (*last ed.;*) *Parsons vs. Parsons,* 2 *Greenleaf,* 298; *Hatcher vs. Millard,* 2 *Coldwell,* 30; *Baker, et al. vs. Dodson,* 4 *Humphreys,* 342; *Winn vs. Bob, et al.,* 3 *Leigh.,* 145.

In each and all of these cases the *rogatio testium* was shown by the mode and manner and circumstances under which the testamentary words were addressed to the witnesses. In none of them were there any words *exclusively* appropriated to the object of "bidding the persons present, or some of them, to bear witness that such was his will, or to that effect."

At common law it was necessary to have the *factum* of the will and the *animus testandi*. This testamentary intent might be shown by any evidence whatever, as for example, that the testator was sick. 7 *Bacon's Abridgt.*, 303; *Swinburne on Wills, Part 1st, sec.* 3.

The additional security afforded by the Statute of Frauds, was that this testamentary intent must, in nuncupative wills, be evidenced by calling on the witnesses—"bidding them to bear witness." But it need not be by words alone. Words and acts may be together used for this purpose, if they be equivalent to calling of attention on acts alone, indicating plainly that the words spoken were designed to be testamentary. Thus understood, the concluding words of the provision ("or to that effect") become operative. Under this Statute, the testator must not only have the intention to make his will, but he must *indicate* that intention. If he does, under such circumstances that the witnesses understand themselves to be called on specially to notice the *factum* of the will, it is "*to that effect.*"

The *animus testandi*, and the "bidding of the persons present to bear witness," are not two separate, distinct, substantive elements in the constitution of a nuncupative will. The *factum* of the nuncupation, and the *animus testandi*, are the essential elements of the will. The calling of the witnesses is but *evidence* of the *animus testandi*.

A testator may feel the importance of impressing upon the minds of the persons present that he is doing a testamentary act—that he is making his will. But after he has done so—after they fully understand from his language, his manner, the impending dissolution, the symptoms of alarm visible

upon his countenance, the changed voice, the speech obscured and blurred, but still earnest in its efforts articulately, and in spite of death, to impress upon them his dying requests, it is trifling to insist that all the objects proposed by the Statute have not been attained, and that he must still go through a prescribed formula, and by *other* and *additional* evidence, *separate from all this*, and as a sort of *collateral matter*, call their attention by certain *words*, equivalent to those used in the Statute, to bear witness.

All the circumstances above enumerated, springing out of and forming part of the transaction, were present in this case; and the Court ought to have permitted the jury, under the third and fourth prayers, to have passed on them.

The first bill of exceptions raises but one question—the competency of Miss Ann Biddle. Upon this exception, see *Cooke vs. Cooke, Ex'r*, 29 *Md.*, 550; *Schull vs. Murray*, 32 *Md.*, 17; *Cannon vs. Crook and wife*, 32 *Md.*, 486; *Johnson and wife vs. Heald, Ex'r*, 33 *Md.*, 352.

The Act of 1864, ch. 109, removes the objection of interest, save as excepted by the Act of 1868, ch. 116. That this witness is not within the spirit, design and scope of this exception, even if she be within its letter, is clear. Admit, for sake of the argument, that she is within the letter. The rule of interpretation, as approved by this Court in 33 Md., 372, will take her out. This exception contemplates an *adversary* proceeding, where the deceased is represented by the executor or administrator. It can have no application to a proceeding, the object of which goes to question his right to represent the estate. It is not a collateral proceeding, where the question comes up incidentally after its direct determination by the grant of letters in a Court of exclusive jurisdiction This is a direct proceeding in that exclusive jurisdiction—the Probate Court.

The real and just extent of the exception is to cases where "an original party to a *contract* or *cause of action* is dead or shown to be a lunatic or insane," and the cause of action

antedates the death or lunacy. If the will propounded in this case is to be considered the cause of action or contract, the right to institute proceedings never arose until the death of the testatrix. That this is the true construction, would appear from what the Court say in *Cannon vs. Crook,* 32 *Md.,* 486.

At Laura L. Biddle's death, Miss Ann Biddle was a competent witness. What has occurred that ought in equity and justice to deprive her of her testimony? In a case of adversary proceeding, on a *contract,* the rule is not impaired, because until an administrator or executor is appointed, there can be no proceeding. Had the nuncupative will been propounded at once, the witness would have been competent, because she has waited, but before it is possible to say that she is guilty of laches, she loses her testimony.

*Alexander Evans,* for the appellees.

Every requisite of a valid nuncupative will is wanting in this case.

1st. There was not a due "*rogatio testium.*" *Code of Pub. Gen. Laws, Art.* 93, *sec.* 306. The deceased himself is required by the Statute of Frauds, to bid the persons bear witness. *Bennett vs. Jackson,* 2 *Phillimore,* 190, (1 *Eng. Eccl. Rep.* 229;) *Parsons vs. Miller,* 2 *Phillimore,* 194, (1 *Eng. Eccl. Rep.* 231;) 1 *Williams on Executors,* 67; *Dorsey vs. Shepherd,* 12 *G. & J.,* 198; 1 *Redfield on Wills,* 188, *ch.* 6, *sec.* 2, *Art.* 8; 2 *Black. Comm.* 501.

2d. The party making the will, must be *in extremis. Prince vs. Hazleton,* 20 *Johns. Rep.* 514; *O'Neill, et al. vs. Smith, adm'r,* 33 *Md.,* 573, 574.

3d. The will was made on interrogation, and the responses were thoroughly vague: "Money;" "All my money;" what does such a bequest mean, even if it were one? Wills made on interrogation are viewed with great suspicion; and to the latest interrogation by one of the witnesses to the nuncupation, Mrs. Hayes: "Laura, *don't* you want your aunt Nancy

to have your money?" (A *suggestive* interrogatory.) Laura, though then fit to make a written will, who ·till that minute had not thought she was going to die, did not make any response. *Dorsey vs. Shepherd*, 12 *Gill & John.*, 192, 201.

4th. With regard to the exception taken to the rejection of the testimony of Miss Nancy Biddle, it will be sufficient to say that she could not, after six months, *vary* her testimony in proof of the will as given before the Orphans' Court. *Code, Art.* 93, *sec.* 307; *and Welling vs. Owens*, 9 *Gill*, 470.

And if her testimony was to be to the *same* effect as that given in the Orphans' Court, she suffered no injury. But it was not competent testimony, under the Act of 1864, ch. 109, or the Act of 1868, ch. 116. *Johnson and Wife vs. Heald*, 33 *Md.*, 368.

BOWIE, J., delivered the opinion of the Court.

The appellees having obtained letters of administration on the personal estate of Laura L. Biddle, from the Orphans' Court of Cecil county, on the 21st of September, 1870, the appellant afterwards, on the 10th of January, 1871, propounded an alleged nuncupative will of said Laura, in the form of depositions of Almira V. Bramell, Matilda White, Cena B. Hayes and Ann Biddle, and prayed the same might be admitted to probate; to which petition the appellees were made parties and summoned to answer.

The respondents having answered, denying that the said Laura ever made any will, the Orphans' Court, at the instance of the petitioner and appellant, transmitted to the Circuit Court for Cecil county the following issue for trial, viz: "Was the alleged nuncupative will of Laura L. Biddle propounded to the Orphans' Court of Cecil county on the 10th day of January, 1871, as the last will and testament of said Laura, in fact and in law her last will and testament?"

On the trial of this issue before the Circuit Court of Cecil, two exceptions were taken by the appellant—the first, to the refusal of the Court to allow the appellant to testify as a wit-

ness in the cause, upon her own offer, and at her own instance, the defendants objecting on the ground, "that *they* were the administrators of said Laura L. Biddle, deceased."

The second exception is founded on the rejection of a series of prayers offered by the plaintiff, and the granting of one submitted by the defendants.

The latter being the converse of the propositions contained in the plaintiff's series, it will be unnecessary to examine these in detail, since it follows, necessarily, that if the defendants' prayer was properly granted, those of the plaintiff were properly refused. The defendants' prayer is equivalent to a demurrer to the evidence. It affirms that, *under the evidence in the case*, the jury must find "the alleged nuncupative will of Laura L. Biddle, propounded to the Orphans' Court, etc., as her last will and testament," was not in fact and in law her last will.

It is based upon the principle, that where there is a total defect of evidence, in any particular, essential to the issue which it was incumbent on the plaintiff to prove, the verdict must be for the defendant.

It strikes at the theory of the plaintiff's prayers, on the ground that there is neither fact nor law to sustain them.

The appellant insists that every preliminary prescribed by the Statute of Frauds and the Code, to establish a nuncupative will, has been expressly or impliedly complied with; that the jury might find from the evidence the testatrix did bid the persons present, or some of them, bear witness that such was her will, or to that effect; or, it might be inferred from acts, such as the nuncupation itself, or circumstances and facts surrounding the transaction.

In the zeal of argument, we are warned by the appellant's counsel not to deny the privilege designed to be secured by the statute, by requiring too rigid compliance with certain formula by persons "*in extremis.*" They argue that the "*animus testandi*" and the "*rogatio testium*" are not two distinct, separate elements in the constitution of a nuncupative will.

" The *factum* of the nuncupation and the '*animus testandi*' are the essential elements of the will." The calling of the witnesses is but the evidence of the " *animus testandi*."

However the interpretation of the Statute of Frauds as to nuncupative wills may have been relaxed in other States, we do not feel at liberty to depart from the policy adopted in the Ecclesiastical Courts of England, and reiterated by our earliest and latest decisions.

Nuncupative wills originated in the tender regard of the law, for cases of extreme necessity, in which, to meet sudden exigencies, it permits them under certain qualified conditions. Conscious of the liability of sick persons to be imposed on in their last moments, the law surrounds them with such guards as it deemed necessary for their protection. They are watched with great vigilance.

The text writers, judicial decisions, and statutes, from the earliest times, indicate great jealousy as to the exercise of the power. They require evidence of a sound and disposing mind, a present intention to dispose, apt words of disposition, and three witnesses called, or bidden by the testator to bear witness to the will, or to that effect; all of which must concur in the last sickness of the deceased.

That distinguished jurist, Chancellor KENT, in the case of *Prince vs. Hazleton*, after citing numerous authorities, showing the legal restraints imposed upon the exercise of the power of nuncupation, concludes with these impressive remarks:

" There is one other consideration which imparts to this subject of nuncupative wills, a momentous character, and ought to incline us to give to them as little countenance as possible. As soon as a nuncupative will is made, it becomes the interest of the legatee that the party's sickness should prove to be his *last* sickness, for if he recovers, the will of course falls to the ground. Not so with a written will. That remains good until revoked, and it cannot be revoked but by writing. Let us, for one moment, pause over this consequence of nuncupative wills and observe with what a

deleterious influence they must suddenly act upon the heart, and what a powerful appeal they at once make to the selfish and dark passions of the human mind." 20 *Johns. Rep.*, 516.

In the case of *Dorsey vs. Sheppard, et al.*, decided in 1841, this Court said: "Nuncupative wills, though tolerated, are by no means favorites of the law. Independent of the Statute of Frauds altogether, the *factum* of a nuncupative will requires to be proved by evidence more strict and stringent than that of a written one in every particular. This is requisite in consideration of the facilities with which frauds in sitting up nuncupative wills are obviously attended. Facilities which absolutely require to be counteracted, by Courts insisting on the strictest proof as to the *facta* of such alleged wills. Hence the testamentary capacity of the deceased, and the '*animus testandi*' at the time of the alleged nuncupation, must appear, in the case of a nuncupative will, by the clearest and most indisputable testimony." *Vide Demann vs. Bonsall*, 2 *Eng. Eccl. Rep.*, 147; 1 *Williams on Ex'rs*, 101; *Priscilla Yarnall's Will*, 4 *Rawle Rep.*, 62; 12 *Gill & Johnson*, 198. The same principles are announced in the late case of *O'Neill vs. Smith*, 33 *Md.*, 573.

It is entirely inconsistent with the letter and spirit of the Statute and Code, to supply by inference, the "*rogatio testium*," the most significant and important of all the precautions imposed by them, involving both the publication and attestation of the will.

The language of the Code is: "No nuncupative will shall be good, etc., that is not proved by the oaths of three witnesses at least, who were present at the making thereof, nor unless it be proved that the testator, at the time of pronouncing the same, did bid the persons present, or some of them, bear witness that such was his will, or to that effect." The most imperative form of language is used. "Negative words *will* make a statute imperative, and it is apprehended affirmative may, if they are absolute, explicit, and peremptory,

and show that no discretion is intended to be given. And with regard to a form prescribed by the Act, it should be observed, that where a remedial statute gives a form, it must be observed." *Dwarris on Statutes*, 9 *Law Lib.*, 55.

The words "to that effect," do not qualify the whole section or all its preceding provisions, but only the last clause of the sentence to which they are annexed, *i. e.*, "to bear witness that such was his will." This may be done in the language of the Code, or by equivalent words, but to supply the "*rogatio testium*" by inference from the nuncupation itself, would render the most essential provision of the Code nugatory; and reduce the measure of proof to the standard of the common law, prior to the Statute of Frauds.

The language used by the supposed testatrix, before being interrogated by Mrs. Hayes, were mere disjointed words, incoherent, disconnected and unmeaning. They required the suggestion of the interrogator to give them sense. Hence, the words in reply, if a will, was a will by interrogation, which of all others, is least favored in law. *Dorsey vs. Sheppard, et al.*, 12 *G. & J.*, 198.

Such a will especially, required full proof of a "*rogatio testium*" to give it validity. Yet all the witnesses who speak to that point, concur in declaring there was no request to bear witness that such was her will. Three witnesses depose "she did not say she wished them to remember these words as her will." Mrs. Hayes, the interrogator, says, "she did not say that she wished us to remember it, or that she wished us to be witnesses to her will," and they proved no other words equivalent, or "to that effect." But Mrs. Hayes "understood," "was of the opinion, based upon all that occurred," "that Laura intended by what she said, to make her will and wanted her to remember it."

This understanding of the witness, or opinion, does not in our judgment, qualify the provisions of the Code. There must be a request to bear witness or something equivalent thereto.

Biddle *vs.* Biddle and Cavender, Adm'rs.

It follows, from what has been said, that in our opinion, there was a fatal hiatus in the testimony offered by the plaintiff to prove a nuncupative will, and therefore the prayers of the plaintiff were properly refused, because there was no evidence of a *"rogatio testium"* in fact, or " in effect," and it would have been error to infer the same, from the acts and circumstances referred to in the prayers.

For the same reasons, the defendants' prayer was properly granted.

It is unnecessary to inquire whether the ruling of the Court below upon the question raised by the first exception was correct or not, as, in the opinion of a majority of the Court, the plaintiff could not have been prejudiced by it.

Her evidence was already before the Conrt in the form of her deposition, and she could not be permitted to supplement it, by proving facts contrary to what was proved by three other witnesses, sworn in her behalf, and without such proof the result must have been the same.

Finding no error in the several exceptions taken below, the rulings of the Court are affirmed and cause remanded, that the Circuit Court may certify to the Orphans' Court the finding on the issues, etc.

*Judgment affirmed and*
*cause remanded.*