Hammett *vs.* Shanks.

(Decided 4th December, 1874.)

---

## JANE M. HAMMETT *vs.* MARY A. SHANKS.

*Nuncupative will.*

A person in his last sickness, in his dwelling house, an hour or two before he died, being of a sound and disposing mind, with intent to dispose of his property, indicated by apt words the disposition he desired to make of it, in the presence of witnesses, some of whom he requested to bear witness that such was his last will and testament. Four witnesses testified substantially in the same way as to the words of the testator. HELD:

That such constituted a valid nuncupative will.

APPEAL from the Orphans' Court of Baltimore County.

On the 8th of August, 1874, the appellant filed her petition and caveat in the Orphans' Court of Baltimore county, alleging that she was the aunt and only heir-at-law

of William D. Blackistone, who died intestate on or about the 29th of July, 1874, in said county; that a certain paper writing without date, was filed in said Court on the 4th of August, 1874, purporting to be the nuncupative will of the said deceased, and that such was not his last will and testament; that the proof of the same was irregular, defective, informal and not in conformity with the laws of the State; and further that at the time when said pretended nuncupative will was made, the deceased was not of a sound and disposing mind, memory and understanding, and capable of making a valid deed or contract; that said will, if made at all, which the petitioner denied, was obtained by fraud and undue influence; that the petitioner was the only surviving aunt of the deceased, who died, leaving no widow, child, brother or sister, father or mother, grandfather or grandmother, or uncle, grandchild, or great grandchild, and that she was the only heir-at-law of the deceased, and was not present at the time when said pretended nuncupative will was alleged to have been made. The petition prayed a plenary proceeding to test the validity of the alleged will, and that letters of administration upon the personal estate of the deceased might be granted to the petitioner. The paper writing referred to in said caveat, as purporting to be the nuncupative will of William D. Blackistone, deceased, as propounded in Court was as follows:

"I give and devise unto my dear cousin, Mary A. Shanks, my store, and all that is in it, as it stands at this date; and either the stallion horse or two of the others, as she may prefer—and the store wagon, all the growing crops, and the expenses of saving the crop, she must pay out of the crop."

[This much of said will was admitted by the respective attorneys to have been written by William J. Blackistone, and the following part by O. P. Macgill, in open Court:]

"And all of the accounts due up to this date, all the money on hand, and to administer on my estate as soon as she could, and not to put it off too long, and let the boys have fifty dollars a piece (pointing to M. F. Corns, George Cloman and William Preston,) and wished his above named cousin to conduct the store as if he were alive."

It having been represented to the Court that William J. Blackistone was the only heir-at-law and next of kin of the deceased, the following affidavit was taken in open Court, and by the Court ruled out as evidence:

"On this 4th of August, 1874, came William J. Blackistone, Millard F. Corns, George Cloman and Adaline M. Anderson, and severally made oath that, on the 29th of July, 1874, William D. Blackistone, late of Baltimore county, deceased, declared to them that the aforegoing paper was his last will and testament, and that the part added since his death, commencing at the words, "And all the accounts," was spoken by him on the said 29th of July, 1874, in our presence, he the said William D. Blackistone, at the same time bidding us to bear witness, that such was his last will and testament, and that it was made in the time of his last sickness, and in the house of his habitation or dwelling."

A citation was issued to Mary A. Shanks, who appeared and on the 12th of August, 1874, answered the petition and caveat. The answer denied the allegations contained in the petition, and prayed the Court to admit the will to probate, and to order letters testamentary to be granted to the respondent in accordance with the wish of the testator. On the same day, William J. Blackistone, Millard F. Corns, George Cloman and Adaline M. Anderson, were produced in Court to testify in behalf of the caveatee.

William J. Blackistone, testified under oath, as follows: The deceased was my own cousin—he kept a store; he told me to get some paper; when I got the paper I asked him what I should put on it; he told me to write down that he

gave his store as it stood, his book accounts and every thing in it to my sister Mary A. Shanks—he wanted her to have one or two horses, as she might wish—she might take the stallion ; if she did not take him, she might take two of the others ; he gave her the growing crops on the land, and she was to save the crops, and pay for saving them out of the crops. He stated that he wanted to give to the two Misses Blackistone, who lived in Baltimore, a wagon and two horses, if Mary A. Shanks should take the stallion ; in the event of the girls taking two horses, they were to have the big wagon; he wanted to give to the three boys, Millard F. Corns, George Cloman and James Preston, who were present, or were sent for, fifty dollars each ; he gave all the rest of his personal property to Mary A. Shanks—he told the boys to bear witness that that was his will. He wanted Mary A. Shanks to administer on his estate—he repeated that twice—he died the same day— he was speechless soon after speaking these words. I commenced writing the will, and think I wrote two or three paragraphs.

Adaline M. Anderson testified to the following : I was present at the last sickness of Wm. D. Blackistone; he died on the 29th day of July last; I think it was about half-past nine or ten o'clock A. M., between those hours ; I was in his room early, he called me to him to take his directions, he told me in case he should die he wanted me to understand that he desired his cousin, meaning Mary A. Shanks, to have his store and all that was in it, and accounts up to date ; that she might go on and make her support; he also said that he wished her to have a horse and wagon and the growing crop, he designated which horse at first, and then said she might take her choice, either take one horse or the two, then he wished her to have the administration, there was no one in the room until he commenced telling me, when I called in Millard F. Corns ; I cannot remember whether any one was in the

room all the time, for my attention was taken up with what Mr. Blackistone was saying to me; I don't remember whether any one was in the room until Mr. William J. Blackistone began taking down what he said; Mrs. Shanks might have been coming and going; I can't tell who was in the room after it was taken down, this testimony was given to me; he repeated it to Mr. Wm. J. Blackistone; I can't tell any other who was present at this time except Millard F. Corns; this was a little after light, it may have been between five or six, or between six or seven o'clock, it was before the doctor got there; his mind was as correct as I had ever seen it when this disposition was made by him; immediately after making these requests, his voice became choked and cloudy and he could not go on.

On cross-examination, the witness stated:

Mrs. Shanks is my niece; I have stated all that I understood Blackistone to say, what he was addressing to me, he was still talking; I think I have stated all that he addressed to me, that I remember, I don't think I have forgotten anything; I did not go to Mr. Blackistone's house at the same time that Wm. J. Blackistone and Mrs. Shanks went there; I was on a visit; I had been there about three weeks prior to his death; I remained there at Mr. Blackistone's invitation; my visit was principally to my niece, Mrs. Shanks.

Millard F. Corns testified as follows:

I knew Wm. D. Blackistone, I was in his employ as clerk; he died on the 29th of July last, between nine and ten o'clock in the morning; I was in his room from about six A. M. until he died; he did not ask any one to do anything for him, he told us that he wanted Mrs. Shanks to have the store and all that was in it, to have all the accounts that was due him up to date, and have all the money on hand, he wanted her to have one horse and wagon, he said he wanted her to have the Norman horse, and if she did not like the Norman horse, she was to have

the choice of two others, he said Norman was equal to any two horses he had ; I asked him what he wanted done with his crops, he told us he wanted Mrs. Shanks to have the crops and pay for saving the crops out of the crops ; he wanted her to give us boys fifty dollars each ; he did not speak our names, he just pointed to us ; he pointed to me, George Cloman and William Preston, we were all in the room ; he wanted Mrs. Shanks to administer on his estate, to do it as quick as possible ; I think that is about all I know ; this was about two hours previous to his death, as far as I can remember ; he was as fair in mind as ever I had seen him ; I have been there about fifteen months steady in his employment ; about ten months at one time, and five months another time. Mr. Blackistone always called Mrs. Shanks cousin, and seemed to be exceedingly fond of her, and seemed to be so because she came to take care of his affairs ; no woman could have taken better care of his affairs than she took care of his. Mrs. Shanks, her father, Mrs. Anderson, George Cloman, Wm. Preston, the children about the house and myself, were in the room at this time ; he asked several times if we understood it, if we did not, he would not be satisfied, referring to what he had said.

On cross-examination the witness said :

Mr. Taylor suggested how he should leave his property about a half or one hour before his death, but he could not speak so as to be understood, this was after he had mentioned how he wanted his property to go ; it was about two hours before his death that he stated what I have said ; Mr. Blackistone was taken Saturday night, and died Wednesday morning, he had not been confined to his bed before Saturday night, before his death for a long time, can't say how long ; he appeared well enough until nine or ten o'clock Saturday night, when he was taken with vomiting, he had been taking medicine all along, the doctor trying to cure him of the rheumatism.

George Cloman testified as follows:

I lived with Mr. Blackistone; he died on the 29th of July, 1874; he died about half-past nine in the morning; I was called about six o'clock to go for Doctor Altervater first, when I came back I went for Doctor Gittings; I was back and forward in the room all the morning; he called me to witness his will; he called me himself; he said Mrs. Shanks should have the store and all that was in it; all the bills, she could collect them; she was to have them; she was to have the books in the store, she was to have one horse, Norman, or two others; he said Norman was equal to any two horses he had; she should have the store wagon, she must have the crops, and save them; and pay expenses out of them for saving them; I believe that is all I know about the will; no, not quite all, he said the boys must have fifty dollars each; we were standing around him; he said for Mrs. Shanks to administer on the property as soon as she could; I know Mrs. Shanks very well; I heard Mr. Blackistone say, that if she would come and take care of him, she should have all he had after his death; he said this before and after she came; she was not present at the time; he seemed to be very fond of Mrs. Shanks, more so than any one else, according to my judgment.

Cross-examined.

Question. You have said Mr. William D. Blackistone called you in to witness his will, where were you at the time; and state what he said; give his language or the words he made use of; state all he said at that time?

Answer. He told me to come to him, and stand right along side of him; he told me to rub his hands with mustard, then he went on about his will; he said to me, Mrs. Shanks was to have the store, and all that is in it; she must have the bills that were out, she must have one horse, Norman, or two others; she must have the store wagon; she must have the crops, she must save them and

pay expenses; she must administer on his property as soon as she could, and that the boys must have fifty dollars each; I believe that was all he said whilst I was present; I was called out at that time, and sent to do something; Millard F. Corns, Mrs. Anderson, Mrs. Shanks and her father were present; I did not take notice of any others, there might have been more; I have stated all I remember William D. Blackistone stated.

Mrs. Mary A. Shanks testified, that she went to live with Wm. D. Blackistone, because he wrote to her after his wife's death, inviting her to come and live with him, to take care of his house and effects.

The caveatee offered the paper writing purporting to be the nuncupative will of Wm. D. Blackistone for probate, and the foregoing testimony. To the admissibility of said paper to probate, and the accompanying evidence, the caveator objected.

The Court decided to hear the evidence proposed to be offered by the caveator, and refused to admit the will to probate at that stage of the case.

On the 17th of August, 1874, the Rev. A. T. Pindell, in behalf of the caveator, testified as follows:

I am a minister in the Protestant Episcopal Church; I was called as a minister of the Gospel to visit Mr. Blackistone, at his residence, in his last sickness. I reached there about thirty minutes before he died. I at once approached the bedside of the deceased; am uncertain whether he knew me or not; Col. Benj. F. Taylor seemed to be trying to take down what he wished should be his will. As in my opinion, time was precious from the appearance of near dissolution, I asked Col. Taylor if I would be seriously interfering with his business, if I had prayers with the dying man, he said no, I prayed with him about three minutes, was about to inquire as to his spiritual state, when Col. Taylor asked him what he wished to be done with the rest of his property, the sick man

seemed to be unable to comprehend, when Col. Taylor requested me as being the nearest to him, to ask the sick man the following question : What disposition do you wish to make with the remainder of your property? This I asked him in a loud and clear voice ; he tried to answer, but his speech was so thick that we could not understand him ; Col. Taylor, who was sitting near the foot of the bed, then said to me, I have here written down his wish, that the bulk of his property shall go to Mrs. Shanks, but we do not know yet, what disposition he wishes to be made of the remainder ; ask Mr. Blackistone, to whom he wishes to give it, as there are some poor relatives in town, to whom he wishes to give something. I said to the sick man, you have stated that you wanted Mrs. Shanks to have the bulk of your property, but there is a balance not yet disposed of, to whom do you wish to leave it? His eye was fixed upon me, when I propounded the question, with a rather stupid stare, he kind of shook his hands and made an effort to speak, but had evidently lost the power of plain speech, for different parties put different interpretations on what he said ; I think Col. Taylor said he wants to divide it amongst three poor relations in Baltimore ; Mrs. Shanks, who was standing nearest to him, said no, that is not it, he means to say that he wants the boys in the store to have fifty dollars apiece ; acting upon these suggestions, I asked him distinctly if he wished certain poor relatives in Baltimore to have it, or if he wished to give it to the boys in the store, he made a struggling motion with his body, and muttered with his lips as if he wanted to say something, but it was all in vain. Being of the opinion that he was not at that moment in a condition to attend to matters, either temporal or spiritual, I gave place to his unwearied nurse, Mrs. Shanks, and retired from the room ; his dissolution seemed to be so rapid, that it appeared only loud strong calls could command his attention, and he would relapse in a kind of drowsy state as soon as he was let

alone. I left the room, because I thought I could be of no use to him, and gave place to the nurse. I did not hear one intelligible expression from him whilst I was in his room, not one expression that I could comprehend or understand; I was sent for in a great hurry, went down in a great hurry, entered the house hurriedly, and am of the impression that Col. Blackistone held in his hand a paper, which he afterwards told me contained an expression of Mr. William D. Blackistone's will; I do not know what became of the paper; Col. Taylor was writing when I got there; when I entered the sick chamber, Col. Taylor was engaged in writing down what I supposed the sick man had just stated, but I learned afterwards from Col. Taylor, that the reason why I was not interrupting proceedings, by having prayers, was, that the Col. was merely making a copy of what had already been written down as the sick man's will, so as to go on and add to it a further expression of his wishes, as I have already stated; he was not able to make any of us understand what he wished to be done with the remainder, and hence, the Colonel's work amounted to nothing; immediately after Mr. Blackistone's death, Col. Blackistone met me in the hall, with a folded paper in his hand, and said to me, holding the paper up, I hold here a statement of what Mr. Blackistone wishes to be done with his property; he gives the most of it to my daughter, Mrs. Shanks, who has been here nursing him, when none of his other relatives would come near; I did not examine the paper, or any paper whatever in the house.

Col. Benjamin F. Taylor testified as follows:

I knew Wm. D. Blackistone; I knew him about fourteen or fifteen years; I reside about a mile from where he died; he married a half-cousin of mine, who died about one or two months before he did; I was sent for on the morning that he died; I got there, I suppose, about eight o'clock, A. M., I don't suppose he lived, after I got there,

more than an hour, or an hour and a half; I went immediately to his room, and those surrounding his bed, asked if he knew me—I say those, because I mean more than one asked if he knew me; there were Mrs. Shanks, Millard Corns, and others; he said that he did—it was Ben Taylor; where is Jennie—that is, my wife; I told him she would be there as soon as the horse could be hooked up to bring her there; I stayed there a few moments, and went out to make some few inquiries; I returned, and went out several times, and was back and forward in the room, and found him about the same, during the time since I first came : I found that there was a paper; Col. Wm. J. Blackistone stated there was a paper purporting to be his wishes, and also stated the purport of it; I had a conversation—really I cannot say whether to Herbert Blackistone—about this paper, or he to me; it was a subject of conversation between us; I know that Herbert Blackistone asked me to get some further expression of W. D. Blackistone's wishes; I did not go immediately—it was a task I did not like to perform, and I asked Dr. Altervater in regard to his condition; he went into the sick room and returned, and stated to me that I might go in and try, that he W. D. Blackistone, had spoken intelligently to him; I then went in, sat upon the bed, asked for pen, ink and paper; they were furnished; and for the will that it was said had been made; it was furnished me; it was without date or signature; I copied it; I don't know where that copy is now, for I threw it down on the bed; (paper purporting to be the nuncupative will of W. D. Blackistone, is shown witness;) that paper, nor any part of it, is in my handwriting; I would not be willing to swear that that is the identical paper from which I copied; I have no recollection of that paper, nor any mark by which I could identify it; it was written on a piece of foolscap; the copy of the paper purporting to be William D. Blackistone's nuncupative will was copied by me, but I never copied any such

thing as that, (laying down the paper purporting to be W. D. Blackistone's nuncupative will,) there is a portion in those brackets relating to the accounts that I did copy, the rest I have no recollection of copying, I may have heard of those, really my understanding is different, I am in hopes the paper I copied may be found; I copied the entire paper that was shown to me; after copying that paper I stated to Wm. D. Blackistone that I wanted to know what he was going to do with his property, he stated it had all been fixed, that he had left Mary Adaline, meaning Mrs. Shanks, the store, and cannot say whether one or two horses, a wagon, and there his articulation became thick; it was my impression that he intended to convey to me the wishes of the paper that I had copied; I told him that he had made a full disposition of his property, and that if there were any other parties that he wanted to leave the balance to I would like to know, I was ready to take it down with pen, paper and ink; I mentioned three female orphan cousins in Baltimore to whom I knew he had been formerly attached; about that time others about the bedside spoke in different ways, whether they should raise him up or give him a little medicine, or something about bodily comfort I could not say ; the Rev. Mr. Pindell and Dr. Gittings came in just about that time, and after I got there I asked Mr. Pindell to question him in reference to the further disposition of his property, and I think he got no articulate answers, at least he did not impart them to me. I really believe he was capable of wishing, but not able to express the wish fully. I only remember this, that before he died I was by his bedside, that Millard Corns asked him if there was any one he wished to see, he said his dear wife, this was not a half hour before he died ; don't think it was more than twenty minutes; Mrs. Shanks immediately said, do you know who this is, I was standing immediately before him, he said Benny, and I went out and told the Rev. Mr. Pindell that he was dying;

it was about one or one and a half hours after I got there that he said he wanted to see his dear wife ; on cross-examination the witness testified further :

(The paper purporting to be the nuncupative will shown witness.) As I said before, the paper which I copied was without date or signature, it was on foolscap similar to this, and its general purport down to the brackets is similar to the one I copied ; the top of this is similar to the one I copied, the bottom not ; Mr. Blackistone said everything had been fixed ; I am sure I did read it to him, I heard him express wishes similar to those expressed in this paper, after I had copied this, I asked him what disposition he had made of the balance, he expressed wishes similar to what I copied, I don't wish you to think I said it was similar to this in every respect, the most important part was similar to this. I do not believe I copied this paper entire, but I really believe I did copy it, down to the brackets, in reference to accounts and administration I heard mentioned, but I cannot say whether I wrote that down or not ; I have no recollection what was said in reference to accounts or administration, or who said it ; I don't know whether this conversation was carried on in or out of the room ; there was a general conversation going on ; I heard about this account and administration in and out of the room ; I cannot say where I heard it ; I believe I was the most intimate friend of the deceased ; never heard him say anything about leaving his property to Mrs. Shanks, or any one else ; my business kept me from him.

Dr. Altervater, testified as follows : I was acquainted with William D. Blackistone for about nine or ten years ; generally I was his family physician ; I attended him in his last illness ; he died of cholic ; he was liable to attacks of rheumatism, ever since I have know him, but more frequent lately ; on cross-examination the witness said : I arrived at his house on the morning of his death—about

six o'clock; his mind was clear, and capable of trans-
acting business; his mind was clear to the time he died,
but his senses—physical—were impaired by approaching
dissolution; the articulation was good when I first went
there, but his voice was husky then; it became impaired
very soon afterwards; on Monday night, when I saw him, I
did not think him dangerously sick; did not until the morn-
ing of his death; did not encourage any fears of death to
his family or himself; I told him I thought he would get
well, until the morning of his death; he died at his resi-
dence about half-past nine o'clock, on the Philadelphia
Road, on the 29th of July.

It was admitted by the attorneys respectively for the
caveator and caveatee, that the personal estate left by Wm.
D. Blackstone, deceased, exceeded the sum of $500 in
value.

The Court on the 26th of August, 1874, passed an order
admitting the nuncupative will of Wm. D. Blackistone to
probate, and dismissing the petition and caveat of the
caveator.

From this order the caveator appealed.

The cause was argued before BARTOL, C. J., BOWIE,
BRENT and ALVEY, J.

*William S. Keech,* for the appellant.

The Courts of different States go as far as they possibly
can in "restricting in the very narrow limits the privilege
of disposing of estates by nuncupation," and "guard its
practical enforcement by the most rigid construction."
*Rankin vs. Rankin,* 9 *Iredell,* 156; *Haus vs. Palmer,* 9
*Harris,* 296; *Yarnell's Will,* 4 *Rawle,* 46; 1 *Redfield on
Wills,* 201; *Tally vs. Butterworth,* 10 *Yerger,* 501.

The provisions of the Statute of Frauds relative to
nuncupative wills, and the rigid and strict construction
which has been put upon each and every provision of that

statute, and of similar statutes in the various States of the Union relating to nuncupative wills, have not been relaxed in Maryland, either by the statute law of the State, or by the decision of our Courts. *Art.* 93, *sections* 306, 307 *and* 322 *of the Code; Dorsey vs. Sheppard,* 12 *G. & J.,* 192; *Welling vs. Owings, et al.,* 9 *Gill,* 467; *O'Neill vs. Smith, Adm'r.,* 33 *Md.,* 569; *Biddle vs. Biddle,* 36 *Md.,* 630.

The "*rogatio testium*," or calling upon the witnesses to bear testimony to the act of nuncupation, is absolutely essential. *Art.* 93, *sec.* 306 *of the Code*; 1 *Redfield on Wills,* 187, 188; 2 *Bl. Comm.,* 500, 501; *Bennett vs. Jackson,* 2 *Phillim.,* 190; *Biddle vs. Biddle,* 36 *Md.,* 630; *Parsons vs. Miller,* 2 *Phillimore,* 194; *Lucas vs. Goff,* 33 *Miss.,* 629; *Philips vs. St. Clements Danes,* 1 *Eq. Cas., Ab.* 404.

This *rogatio testium* must be proved by the oaths of three witnesses at least. *Code, Art.* 93, *sec.* 306.

In this case but *one* witness, Geo. Cloman, testifies to this *rogatio testium,* and hence the requirements of the law of this State have not been even substantially complied with in this respect, much less is there that rigid and literal compliance with the statute which Courts require.

If the act of nuncupation was complete, what was the necessity for an attempt to prepare a *written* will?

From all the evidence in the case, it would seem that the act of nuncupation was not thought complete at the time, and the evidence of the witnesses as to what decedent's wishes were, or what property he disposed of by his alleged nuncupative will, and who are beneficiaries under it, is very conflicting.

Under the authorities cited, and under all the testimony produced in this case, the alleged nuncupative will cannot be sustained, and the order of the Orphans' Court admitting the same to probate and dismissing with costs the petition and caveat of the appellant, must be reversed.

At what point of time on the morning of the decedent's death did the act of nuncupation take place? Does the record show? Ought it not to be made to appear to the Court, that the decedent supposed he was dying, or in imminent danger of death, with no hope of recovery, before a nuncupative will is admitted to probate? Ought not the decedent to be in the same condition that a person must be in before his dying declarations are admitted in evidence? Does the record show the deceased supposed he was in that condition?

*John I. Yellott* and *O. P. Macgill,* for the appellee.

Nuncupative wills are unquestionably recognized by the laws of Maryland, and to constitute a valid unwritten will it is only necessary that there be a sound and disposing mind on the part of the testator, at the time of making the same; a present intention to dispose; apt words of disposition; proof of the will by at least three persons who were present at the making of the same; that the testator at the time of pronouncing the will, requested "the persons present, or some of them, to bear witness that such was his will, or to that effect;" that the will was "made in the time of the last sickness of the deceased, and in the house of his habitation." When these requisites concur and unite, and there is no proof that the testator neglected a written disposition of his property with the opportunity to make such disposition, an oral testamentary disposal of personal property is as valid as a disposal thereof by a written will. *Code, Art,* 93, *sec.* 306; *Dorsey vs. Sheppard,* 12 *G. & J.,* 192; *Brayfield vs. Brayfield,* 3 *H. & J.,* 208; *Welling vs. Owings,* 9 *Gill,* 467; *Dorsey's Test. Law of Md.,* 54; *O'Neill vs. Smith,* 33 *Md.,* 573; *Biddle vs. Biddle,* 36 *Md.,* 630; *Parsons vs. Parsons,* 2 *Greenleaf,* 298; *Winn vs. Bob, et al.,* 3 *Leigh,* 145; *Parkison vs. Parkison,* 12 *Smedes & Marsh.,* 673; *Offutt vs. Offutt,* 3 *B. Monroe,* 162; *Phœbe vs. Boggess,* 1 *Grattan,* 129; *Marks vs. Bry-*

*ant,* 4 *Hen. & Mun.,* 91 ; *Portwood vs. Hunter,* 6 *B. Munroe,* 538 ; *Gwin vs. Wright,* 8 *Hump.,* 639.

In this case all the requisites above enumerated are present and unite in the alleged testamentary transaction. When the nuncupation was reduced to writing within six days after utterance, the witnesses thereto, Wm. J. Blackistone, Millard Corns, George Cloman and Adaline Anderson, solemnly swore that the testamentary words were spoken by the testator in *their* presence, the said testator " at the same time *bidding us* (the said witnesses,) *to bear witness that such was his last will and testament."* The *" rogatio testium,"* the most important element, is here fully and explicitly shown.

It was right, and the exercise of proper caution and prudence that the supposed nuncupation was reduced to writing and attested within six days after the speaking thereof by the testator. A nuncupative will may be reduced to writing, together with the attestation or testimony in support of the same, at any time within six days after the making of the will, whether the widow or next of kin be present or not, but cannot be probated within fourteen days after the death of the testator, unless opportunity is afforded the widow or next of kin to contest the same. *Code, Art.* 93, *sections* 307 and 322 ; *Welling vs. Owings,* 9 *Gill,* 470.

On the 4th of August the witnesses to the speaking of the will, were taken before the Orphans' Court and examined, and the testamentary language of the testator thus ascertained, reduced to writing and sworn to by the witnesses. No administration was granted, nor does it appear that any wish was then expressed to have the will admitted to probate, or to have letters granted. The first request to have the will admitted to probate and to order letters to be granted, was made by the appellee on the 12th of August, in the presence of the caveator and next of kin, who was then in Court. The same day, the witnesses to

the will were examined, and cross-examined by the attorney for the caveator in open Court, and upon the conclusion of this testimony, the caveatee renewed her request, August 19th. The caveator produced her testimony in support of the caveat and petition; and the order of the Court admitting the will to probate, was not passed until August 26th, more than fourteen days after the death of the testator and in the presence of the next of kin.

That portion of the will which was written by Wm. J. Blackistone, at the request of the deceased, embraces nearly or quite all the bequests to Mrs. Shanks, the appellee, in the nuncupation propounded in the Court below. The desire that she should have all the store accounts, and that she should administer upon the estate, was expressed by the deceased as part of the directions to the draughtsman, who attempted, but for some unexplained reason, failed to write a will. The instructions given to the draughtsman in regard to the will, were partially written before the death of the testator, and fully written subsequent to his death. Inefficiency on the part of the writer prevented the full writing of the will, and when Col. Taylor desired to write it out, the "act of God" had intervened, and the sick man was physically unable to say more than that "it had all been fixed," thereby showing that the directions given by him were intended to operate after death as his will. A partially written, but unfinished will, under such circumstances, will be admitted to probate as a valid nuncupative will. *Dorsey's Testamentary Law,* 57, 60; 1 *Harris & McHen.,* 509; *Boofter vs. Rogers,* 9 *Gill,* 44–53; *Weems vs. Weems,* 19 *Md.,* 348; *Bayldon vs. Bayldon,* 2 *Eng. Eccles. Rep.,* 509; *Allen vs. Manning,* 2 *Eng. Eccl. Rep.,* 391; 1 *Jarman on Wills,* 91–95, *and notes,* (side pages;) *Offutt vs. Offutt,* 3 *B. Munroe,* 162; *Phœbe vs. Boggess,* 1 *Gratt.,* 129; *Mason vs. Dunman,* 1 *Munfd.,* 456; *Parkison vs. Parkison,* 12 *Smedes & Marsh.,* 673.

BARTOL, C. J. delivered the opinion of the Court.

This is an appeal from an order of the Orphans' Court of Baltimore county, admitting to probate the nuncupative will of William D. Blackistone deceased.

Some of the witnesses by whom the nuncupation was proved, were legatees, and objection was made below to their competency; this objection does not appear to be urged in the brief of the appellant. Nor would it avail, since the decision in *Estep vs. Morris*, 38 *Md.*, 417, and in *Harris vs. Pue*, 39 *Md.*, 535, in which it was held that by the Acts of 1864 and 1868, a party who takes an interest under a will has been made a legal and competent witness to prove it.

There being no valid objection to the competency of the witnesses in this case, the only question upon the appeal, is whether their testimony is sufficient to establish the alleged nuncupation, as a valid unwritten will of Wm. D. Blackistone deceased. A careful examination of the testimony has brought us to the same conclusion which was reached by the Orphans' Court, and in our opinion their order admitting the will to probate ought to be affirmed.

The requisites to constitute a valid nuncupative will, under our Code, *Art. 93, sec.* 306, have been clearly defined in *Dorsey vs. Sheppard*, 12 *G. & J.*, 192 ; *O'Neill vs. Smith*, 33 *Md.*, 569, and *Biddle vs. Biddle*, 36 *Md.*, 630. In those cases the alleged nuncupation was held to be unsupported by the proof. But the present case is dissimilar from them in every essential particular. Without recapitulating the testimony ; it is sufficient for us to state as the conclusions which it clearly establishes :

1st. That the testator was of sound and disposing mind at the time of making the same.

2nd. That he had the *animus testandi*, or present intent to dispose of his property by will, and used apt words of disposition.

3rd. The will has been proved by four witnesses, who all testify substantially in the same way, as to the words of the testator.

4th. The *rogatio testium* is clearly proved; or to use the language of the Code, the testator at the time of pronouncing the will, "requested the persons present, or some of them, to bear witness that such was his will, or to that effect."

5th. It is proved that the will "was made in the time of the last sickness of the deceased, and in the house of his habitation."

The testimony shows conclusively, that the nuncupation was made, when the testator was in immediate apprehension of death, and when he had not the time or opportunity to make a written will; which in *O'Neill vs. Smith*, was defined to be the meaning of the terms of the Code, requiring such wills to be made "*in the time of the last sickness of the deceased.*"

Being of opinion that all these requisites of the law have been complied with, in this case, we have no hesitation in affirming the order of the Orphans' Court.

                              *Order affirmed, and*
                                   *cause remanded.*

(Decided 8th December, 1874.)